**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JESUS LUGO, *et al.*, *on behalf of themselves, FLSA Collective Plaintiffs, and the Class*<br><br>Plaintiffs,<br><br>-against-<br><br>CITY WINERY, LLC, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-05135 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE CERTIFICATION**

C.K. Lee, Esq. (CL 4086)
Lee Litigation Group, PLLC
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel: (212) 465-1188
Email: cklee@leelitigation.com
*Attorneys for Plaintiffs,*
*FLSA Collective Plaintiffs, and the Class*

## TABLE OF CONTENTS


TABLE OF EXHIBITS ........ ii

TABLE OF AUTHORITIES ........ iii

I. PRELIMINARY STATEMENT ........ 1

II. STATEMENT OF FACTS ........ 2

A. Defendants Operate City Winery as a Single Integrated Enterprise ........ 2

B. Defendants Subjected All Tipped Employees to the Same Unlawful Pay Policies ........ 8

III. DEFENDANTS' COMMON POLICIES VIOLATE THE LAW ........ 9

A. Defendants' Withholding of Tip Records Independently Invalidates the Tip Credit ........ 9

B. Defendants Unlawfully Retained Gratuities Earned at Private Events and Buyouts ........ 11

C. Defendants' Excessive Non-Tipped Side Work Independently Invalidates the Tip Credit 16

D. Defendants Required Employees to Work Off the Clock ........ 17

IV. THIS COURT HAS PERSONAL JURISDICTION TO CERTIFY A NATIONWIDE COLLECTIVE ........ 18

V. ARGUMENT ........ 19

A. The Standard for Conditional Certification Is Lenient ........ 19

B. The Merits of Plaintiffs' Claims Are Immaterial at This Stage ........ 20

C. Plaintiffs Have Made More Than the Modest Factual Showing Required ........ 20

D. Early Notice to Similarly Situated Employees Is Appropriate and Necessary ........ 21

E. Discovery of Names and Contact Information Is Proper and Necessary ........ 22

F. The Proposed Notice Is Fair and Adequate ........ 22

VI. CONCLUSION ........ 23

# TABLE OF EXHIBITS

*All Exhibits are Attached to the Declaration of C.K. Lee*

**Exhibit A** (Plaintiffs' Proposed Notice to the Collective)

**Exhibit B** (Art. and LinkedIn of Chief People Officer for City Winery Nicole Sanchez)

**Exhibit C** (Defendants' Handbook at LUGO000204)

**Exhibit D** (City Winery "Location" Webpage)

**Exhibit E** (City Winery "Timeline" Webpage)

**Exhibit F** (Defendants' "Our Story" Webpage)

**Exhibit G** (Michael Dorf's Webpage)

**Exhibit H** (Michael Dorf's "Timeline" Webpage)

**Exhibit I** (City Winery Career Page)

**Exhibit J** (Defendants' Interrogatory Responses)

**Exhibit K** (Defendants' Gift Card Webpage)

**Exhibit L** (Defendants' Webpage)

**Exhibit M** (Defendants YouTube Webpage)

**Exhibit N** (Example Event Contract for Defendants)

**Exhibit O** (New York State Liquor Authority Handbook for Retail Liquor Licensees)

**Exhibit P** (Defendants' Document Responses)

**Exhibit Q** (Defendants' Event Invoices)

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680, 687 (1946) ........ 15

*Brennan v. Arnheim & Neely, Inc.*,
410 U.S. 512, 518 (1973) ........ 8

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
582 U.S. 255 (2017) ........ 23

*Button v. Metro. Club, Inc.*,
187 A.D.3d 630, 630 (1st Dep't 2020) ........ 20

*Cabrera v. Stephens*,
2017 WL 4326511, at 7 (E.D.N.Y. 2017) ........ 28

*Chichinadze v. BG Bar Inc.*,
517 F. Supp. 3d 240, 255 (S.D.N.Y. 2021) ........ 15

*Daimler AG v. Bauman*,
571 U.S. 117, 137 (2014) ........ 23

*Fasanelli v. Heartland Brewery, Inc.*,
516 F. Supp. 2d 317, 321 (S.D.N.Y. 2007) ........ 25, 27

*Flood v. Carlson Rests. Inc.*,
94 F. Supp. 3d 572 (S.D.N.Y. 2015) ........ 21

*Foster v. Food Emporium*,
2000 U.S. Dist. LEXIS 6053, at 5 (S.D.N.Y. Apr. 26, 2000) ........ 26

*Garcia v. Chipotle Mexican Grill, Inc.*,
2016 U.S. Dist LEXIS 153531, at 1 n 1, 25 (S.D.N.Y. Nov. 3, 2016) ........ 26

*Garriga v. Blonder Builders Inc.*,
2018 U.S. Dist. LEXIS 171887, at *15–17 (E.D.N.Y. Sept. 28, 2018) ........ 27

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915, 924 (2011) ........ 23

*Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165, 170 (1989) ........ 26

*Iglesias-Mendoza v. La Belle Farm, Inc.*,
239 F.R.D. 363, 367–68 (S.D.N.Y. 2007) .......... 24

*Inclan v. N.Y. Hospitality Grp., Inc.*,
95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015) .......... 14

*Juarez v. 449 Restaurant, Inc.*,
29 F. Supp. 3d 363 (S.D.N.Y. July 2, 2014) .......... 8, 13

*Khalil v. Original Homestead Rest., Inc.*,
2007 U.S. Dist. LEXIS 70372, at *3 (S.D.N.Y. Aug. 9, 2007)* .......... 26

*Lee v. ABC Carpet & Home*,
236 F.R.D. 193, 202 (S.D.N.Y. 2006) .......... 27

*Lynch v. United Servs. Auto. Ass'n*,
491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007) .......... 25

*Machuca v. Villaggio Catering Corp.*,
Dkt. No. 43 (E.D.N.Y. Jan. 12, 2015) .......... 12

*Maor v. Glorious Food, Inc.*,
129 A.D.3d 582, 582 (1st Dep't 2015) .......... 20

*Mayes v. Gerber Grp. L.P.*,
2025 N.Y. Slip Op. 50347(U), at *2–3 (Sup. Ct., Kings County Mar. 18, 2025) .......... 19

*Myers v. Hertz Corp.*,
624 F.3d 537, 554–55 (2d Cir. 2010) .......... 24

*Provencher v. Bimbo Foods Bakeries Distribution LLC*,
(2d Cir. May 4, 2026) .......... 7, 23, 24

*Ramos v. DNC Food Serv. Corp.*,
2020 U.S. Dist. LEXIS 96123, at 29 (S.D.N.Y. June 1, 2020) .......... 28

*Rivera v. Ndola Pharm. Corp.*,
497 F. Supp. 2d 381, 388 (E.D.N.Y. 2007) .......... 15

*Samiento v. World Yacht, Inc.*,
10 N.Y.3d 70, 78–79 (2008) .......... 18, 20

*Sipas v. Sammy's Fishbox, Inc.*,
2006 U.S. Dist. LEXIS 24318, at 8 (S.D.N.Y. Apr. 24, 2006) .......... 26

*Toure v. Cent. Parking Sys. of N.Y.*,
2007 U.S. Dist. LEXIS 74056, at *6* (S.D.N.Y. Sept. 28, 2007)........ 24

*Young v. Cooper Cameron Corp.*,
229 F.R.D. 50, 54 (S.D.N.Y. 2005)........ 25

**Statutes**

29 U.S.C. § 203(m)........ 14, 21
29 U.S.C. § 203(m)(2)(B)........ 19
29 U.S.C. § 203(r)........ 8
29 U.S.C. § 207........ 22
29 U.S.C. § 211(c)........ 14
29 U.S.C. § 216(b)........ 24
29 U.S.C. § 206........ 22
NYLL § 196-d........ 18
NYLL § 196-a........ 15

**Rules**

§ 146-2.19(a)-(c)........ 19, 20, 21
12 N.Y.C.R.R. § 146-2.18........ 14, 18, 21
29 C.F.R. § 516.28........ 14
29 C.F.R. § 531.52(a)........ 19
29 C.F.R. § 531.56(e)........ 21
29 C.F.R. § 779.206........ 8

## I. PRELIMINARY STATEMENT

Plaintiffs Jesus Lugo and Anna Marie Ray (together, "Plaintiffs") bring this action on behalf of themselves and all other tipped employees employed by Defendants and seek conditional certification of a collective action under the Fair Labor Standards Act ("FLSA"). The collective class shall consist of all current and former tipped employees—including servers, bartenders, barbacks, bussers, and food runners—employed at any City Winery location at any time from six years before the filing of the Complaint through the date of the Court's Order approving this motion (the "Covered Employees").

Plaintiffs easily satisfy the lenient standard for conditional certification. Plaintiffs are entitled to this relief because Plaintiffs and the Covered Employees were subject to the following unlawful pay policies: **First,** Defendants claimed an invalid tip credit because Defendants refused to provide employees the tip records the law requires (Defendants still refuse to provide such documents even in discovery). **Second**, Defendants unlawfully retained gratuities that customers left for tipped staff at private events, caterings, and buyouts—including mandatory administrative fees that New York law treats as gratuities owed to Covered Employees. **Third**, Defendants caused Covered Employees to engage in excessive non-tipped side work that invalidates the tip-credit. **Fourth**, Defendants required Covered Employees to perform work off the clock—before and after their scheduled shifts, during mandatory pre-shift meetings and trainings and on monthly "deep clean" days—for which they were never paid.

Defendants administered these policies through a common human resources department and a common payroll system that controlled every City Winery location, and Defendants' own standardized event invoices confirm that the gratuity-retention policy was enterprise-wide.

Four sworn declarations establish that these policies were company-wide rather than confined to a single location. Named Plaintiffs Lugo and Ray describe the policies at Defendants' New York venues, and Jamaya Freeman describes the identical policies at Defendants' Pittsburgh, Pennsylvania location. Further, Defendants' former Regional Director of Operations, Corwin Kilvert (who worked at both the Pittsburgh Restaurant and Defendants' New York headquarters), as a member of Defendants' own executive management team, corroborates that the Restaurants operate as a common enterprise, with a single chain of command leading up to Defendant Dorf. Mr. Kilvert confirmed centralized human resources and payroll for every location nationwide, and that employment policies were "virtually identical" from across the country. Kilvert Decl. ¶¶ 1–4, 10–11. In this Circuit, a single affidavit can support conditional certification; Plaintiffs offer four, spanning multiple States and venues, and from a member of Defendants' own executive team. This is far more than the "modest factual showing" the law requires.

Because Defendant City Winery, LLC is organized in Delaware and headquartered in and directs its national operations from New York State, this Court has general personal jurisdiction over Defendants and may certify a collective that includes Covered Employees at City Winery's locations outside New York State, consistent with the Second Circuit's recent decision in *Provencher v. Bimbo Foods Bakeries Distribution LLC*, No. 24-3112 (2d Cir. May 4, 2026). Plaintiffs' motion should be granted.

## II. STATEMENT OF FACTS

### A. DEFENDANTS OPERATE CITY WINERY AS A SINGLE INTEGRATED ENTERPRISE

Defendant City Winery, LLC owns and operates "City Winery," a national hospitality brand of combined restaurant, winery, and live-music venues. Plaintiffs identify thirteen City Winery locations that Defendants own and operate as a single integrated enterprise—five in New York (Pier 57, Grand Central, Rockefeller Center, City Vineyard, and Hudson Valley) and eight

others in Atlanta, Boston, Columbus, Washington, D.C., Philadelphia, Pittsburgh, St. Louis, and Nashville (collectively, the "Restaurants")—and it is the tipped employees at those thirteen Restaurants who are at issue on this motion.

All thirteen Restaurants are properly in this motion as Defendants operate all locations using the same policies, same executive management team, same human resources personnel, and same payroll department. Kilvert Decl. ¶¶ 1, 10. Defendants' own Vice President of Human Resources describes the enterprise in exactly those terms: one company "across seven states, 13 locations +/1500 employees." **Exhibit B** (Art. and LinkedIn of Chief People Officer for City Winery Nicole Sanchez). City Winery, LLC maintains its one headquarters at 25 11th Avenue, New York, New York—the same address as its Pier 57 flagship—from which it manages and directs its entire Restaurant network. Kilvert Decl. ¶¶ 1, 10.

For purposes of the FLSA, distinct corporate entities that operate as an integrated enterprise are treated as a single employer. Courts weigh (1) the interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control, with centralized control of labor relations the most significant factor. *See Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014). The FLSA reinforces the point through its definition of "enterprise" as related activities performed through unified operation or common control for a common business purpose. 29 U.S.C. § 203(r); *see Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518 (1973); 29 C.F.R. § 779.206.

Defendants' own corporate records and public statements demonstrate the common management, policies, and enterprise:

- **One payroll department.** All employees, no matter where they worked, were instructed to contact a single shared payroll department at Defendants' 25 11th Avenue headquarters, using the same email (payroll@citywinery.com) for payroll questions. **Exhibit C** (Defendants' Handbook at LUGO000204).

- **Employee interchange.** Employees were interchanged among the locations as needed: Plaintiff Ray regularly worked at both Pier 57 and City Vineyard, and Plaintiff Lugo worked at both Grand Central and Pier 57—scheduling that could not be coordinated if each Restaurant were an independent business. Ray Decl. ¶¶ 1, 5; Lugo Decl. ¶¶ 1–2.
- **One brand, one website.** Every Restaurant is advertised on a single website whose copyright is held by City Winery, LLC, with a single corporate timeline tracing the enterprise from its first location at Pier 57. **Exhibit D** (City Winery "Location" Webpage); **Exhibit E** (City Winery "Timeline" Webpage).
- **Common Menu, Food, and Brand.** All City Winery locations are designed to provide a consistent brand experience, featuring a similar look and feel, atmosphere, décor, and menu offerings across each venue. Kilvert Decl. ¶¶ 5-6.
- **Common ownership, publicly proclaimed.** Defendants' own "Our Story" page states that the Restaurants are all owned by Mr. Dorf; his biography and career timeline describe one company expanding location by location; and public sources report the same common ownership. **Exhibit F** (Defendants' "Our Story" Webpage); **Exhibit G** (Michael Dorf's Webpage); **Exhibit H** (Michael Dorf's "Timeline" Webpage).
- **One hiring portal.** Defendants post job openings for every Restaurant on a single, collective careers website. **Exhibit I** (City Winery Career Page).
- **One HR department, one handbook.** A centralized human resources department, led by Vice President Nicole Sanchez from the New York headquarters, implements common policies and a common employee handbook at every Restaurant, and a centralized "learning and development department" uniformly trains all new employees. Ms. Sanchez publicly states that she leads "the HR function for City Winery across seven states, 13 locations +/1500 employees," overseeing "employee relations, benefits administration, payroll, talent acquisition, and organizational development." **Exhibit B**; *see also* **Exhibit J** (Defendants' Interrogatory Responses).
- **One gift card.** The Restaurants share a centralized gift card system—cards "can be redeemed online or at any of our locations." **Exhibit K** (Defendants' Gift Card Webpage).
- **Common sourcing and marketing.** All Restaurants source their wine-making grapes from the same sources, and all are promoted on a single collective YouTube account. **Exhibit L** (Defendants' Webpage); **Exhibit M** (Defendants YouTube Webpage).
- **One contracting party.** Private-event contracts are executed by City Winery, LLC itself—even for events held at City Vineyard or Grand Central—rather than by the location-level entities. **Exhibit N** (Example Event Contract for Defendants) at 2, 12. For example, Defendants 03/29/2023 contract identifies City Vineyard at Pier 26 as the venue for a banquet event. However, the client entered the contract with City Winery, LLC, not City Vineyard, LLC. *Id.*

Defendants' own former senior management confirms this integration from the inside. Declarant Corwin Kilvert worked for Defendants from approximately April 2023 until April 2024

in management and director-level positions. He began his employment at Defendants' Pittsburgh Restaurant and, in or around August 2023, was promoted to Regional Director of Operations ("RDO") at Defendants' corporate headquarters, working out of the Pier 57 location. During this period, he oversaw overseeing four of Defendants' New York City venues—City Vineyard, City Winery Pier 57, City Winery Grand Central, and the City Winery pop-up at Rockefeller Center. Kilvert Decl. ¶¶ 1–2, 4. From what Kilvert "saw and experienced" while working for Defendants, "all of their restaurants . . . operated together," were "run by the same people, had the same owners, and worked toward the same overall business goals." *Id.* ¶ 1. And Kilvert confirms from the management side what Plaintiffs attest to from the employee side: employees "would regularly get transferred between these venues." *Id.* ¶ 4.

Kilvert's testimony traces a single chain of command running through every Restaurant. As Regional Director of Operations, Kilvert reported to Defendants' National Director of Operations—to whom all General Managers at locations outside New York City also reported—and he reported directly to Individual Defendant Michael Dorf, who "would text [Kilvert] directly regarding work-related matters across Defendants' Restaurants"; when Defendants later hired a Chief Operating Officer, Kilvert reported directly to him. Kilvert Decl. ¶¶ 2–3. When the National Director of Operations was let go in or around November 2023, Kilvert was required to take over those national responsibilities in the interim, handling operational matters for Restaurants outside New York City—including traveling to Defendants' Nashville location to help with operations. *Id.* ¶ 6. Even Defendants' new restaurant openings ran through the same senior team: Kilvert, Defendant Dorf, and other high-level personnel together provided input into the new location's blueprints, seating arrangements, layouts, etc.. *Id.* ¶ 5.

Kilvert also corroborates the centralized control of labor relations that is the most significant factor in the single-employer analysis. Human Resources "was centralized for all locations across the country." Kilvert Decl. ¶ 10. Nicole Sanchez served as Vice President of Human Resources "for all City Winery locations nationwide, not just the New York locations," and "was responsible for providing guidance to all locations in terms of compliance with employment laws." *Id.* "[P]ayroll, marketing, coordination and logistics with production and talent, and venues for all locations were all centralized and operated from the headquarters in New York City." *Id.* Defendants' remaining operations were equally interrelated: (i) a single Corporate Chef negotiated contracts and nationwide pricing with shared food-supply vendors—including US Foods and Singer—and "oversaw all properties' food supply"; (ii) City Winery wine comes from a central location and is sold at every Restaurant and through Defendants' shared website; (iii) Defendants used the same maintenance contractors across their New York City venues; (iv) and headquarters "conducted national booking for all locations," managed all corporate marketing and a centralized social-media presence, and had all talent agents reporting to the same person "across all markets." *Id.* ¶¶ 7–9. Finally, having worked at both the Pittsburgh Restaurant and Defendants' New York City venues, Kilvert observed that Defendants' "employment policies and practices were virtually identical" in both—and he "heard about constant lawsuits being filed in different states regarding issues with tip distribution," including comments from Ms. Sanchez and the General Manager at Defendants' corporate location "regarding depositions and similar legal matters." *Id.* ¶ 11.

The FAC further alleges that Mr. Dorf and City Winery, LLC are listed on the liquor licenses for all of the New York Restaurants, and that Mr. Dorf is listed, directly or indirectly, on the licenses for the remaining Restaurants. *See* **Exhibit O** (Liquor License). Pursuant to the New

York State Liquor Authority Handbook for Retail Liquor Licensees, New York State liquor license holders must (1) prevent sales of liquor to minors, (2) prevent disorder, (3) confine service and consumption of liquor to the licensed area, (4) prevent sales of liquor to visibly intoxicated persons, (5) prohibit their businesses from offering unlimited drink specials, (6) ensure licensed restaurants have suitable kitchen facilities to prepare and serve a full menu whenever their business is open, (7) prevent individuals from appearing nude or partially nude on the licensed premises, (8) prevent the premixing of liquor, (9) prevent the refilling of liquor, (10) prevent possession of untaxed cigarettes & tobacco products, (11) prevent contamination of bottles, (12) maintain adequate books and records of all transactions involving the licensed business, (13) ensure proper identification of all beer taps, (14) ensure compliance with all stipulations and conditions of the liquor license agreement, (15) comply with all state and local laws and regulations governing the operations of the licensed business. *See* **Exhibit O** (New York State Liquor Authority Handbook for Retail Liquor Licensees). In short, Mr. Dorf would be required to have full operational responsibility for the Defendants.

In this matter, it cannot be disputed that Defendants (1) engaged in related activities, (2) were under common control, and (3) had common business purpose. Because Defendants operate their Restaurants and the Covered Employees working at those restaurants through a common, centralized management, the violations impacting one employee payroll will be found in all others subject to that same management. Consequently, conditional collective certification is appropriate for all employees of Defendants. *See Machuca v. Villaggio Catering Corp.*, No. 14 Civ. 3508, Dkt. No. 43 (E.D.N.Y. Jan. 12, 2015) (granting plaintiffs' motion for FLSA collective certification for different stores based on common ownership, logo, menu and website on which defendants advertise all locations); *Juarez v. 449 Restaurant, Inc.*, 29 F. Supp. 3d 363, 370-372 (S.D.N.Y.

July 2, 2014) (inferring that unlawful pay policies implemented at one store extended to other locations because all stores were run as an "integrated enterprise" with common ownership and same menu, décor and website).

The named Plaintiffs and declarants illustrate the enterprise's reach: Plaintiff Lugo worked as a bartender at City Winery Grand Central and trained at City Winery Pier 57; Plaintiff Ray worked as a bartender and server at City Vineyard and trained at Pier 57; and declarant Freeman worked as a bartender at City Winery in Pittsburgh, Pennsylvania. Lugo Decl. ¶ 1; Ray Decl. ¶ 1; Freeman Decl. ¶ 1. Kilvert spanned the enterprise from the management side: hired at Defendants' Pittsburgh Restaurant, promoted to Regional Director of Operations at the New York headquarters, and sent to Nashville when national operations required interim coverage. Kilvert Decl. ¶¶ 2, 6. Because Defendants operate the thirteen locations as one integrated enterprise, the tipped employees at all of them—wherever situated— properly are aggregated as part of a single collective action.

### B. DEFENDANTS SUBJECTED ALL TIPPED EMPLOYEES TO THE SAME UNLAWFUL PAY POLICIES

The declarations, together with Defendants' own event invoices and the discovery record, establish four categories of unlawful policies that Defendants applied to Plaintiffs and to every Covered Employee, regardless of location: the unlawful retention of gratuities earned at private events and buyouts; an invalid tip credit—invalid both because Defendants withheld the tip records needed to substantiate it and because Defendants demanded excessive non-tipped side work; and caused employees to engage in uncompensated off-the-clock work. Each is detailed below.

## III. DEFENDANTS' COMMON POLICIES VIOLATE THE LAW

### A. DEFENDANTS' WITHHOLDING OF TIP RECORDS INDEPENDENTLY INVALIDATES THE TIP CREDIT

Defendants paid Plaintiffs and the Covered Employees sub-minimum cash wages on a tip-credit basis: Lugo and Ray were paid $10.00 per hour against a claimed $5.00 tip credit, and Freeman was paid a tipped rate of $2.83 per hour at the Pittsburgh location. Lugo Decl. ¶ 5; Ray Decl. ¶ 6; Freeman Decl. ¶ 2. The tip credit, however, is not automatic. It is the employer's burden to establish its entitlement to the credit, including that each tipped employee actually received tips at least equal to the credit claimed. *See* 29 U.S.C. § 203(m); *Inclan v. N.Y. Hospitality Grp., Inc.*, 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015). To that end, federal and state law require employers to make and preserve records of their tipped employees' tips. *See* 29 U.S.C. § 211(c); 29 C.F.R. § 516.28. And New York's Hospitality Industry Wage Order requires employers who impose charges purported to be gratuities to "establish, maintain and preserve for at least six years records of such charges and their dispositions," and to make those records "regularly … available for participants in the tip sharing or tip pooling systems to review." 12 N.Y.C.R.R. § 146-2.18(c)–(d).

Defendants' policy was the opposite: Defendants refused to provide tip sheets to employees, even upon request. Lugo attests that Defendants "never provided or showed us any tip sheets," leaving employees "no way to verify" whether they were paid their tips—and that when his coworker pressed management for a breakdown of his tips, management brushed him off with assurances that they were "working on it," though "nothing ever changed." Lugo Decl. ¶ 12. Ray attests to the same policy. When she and her coworkers complained that they could never see how tips were distributed, management responded only, "Sorry, but this is a new business and we're still figuring it out"—though the company had been open for years. Ray Decl. ¶ 13. This is seen

again by Freeman, who learned what tips she was paid for a $50,000 wedding only from the $2.85 line on her paystub. Freeman Decl. ¶ 11.

Litigation has not changed anything. More than thirteen (13) months after this action was filed—and months into fact discovery, after Plaintiffs' document requests and a formal deficiency letter—Defendants still have not produced a single tip sheet. *See* **Exhibit P** (Defendants' Document Responses); *see also* Lee Decl. ¶ 20. Defendants' continued withholding either demonstrates that Defendants never created and maintained the tip records the law requires, which is itself a violation. At a minimum, Defendants withholding corroborates Plaintiffs' testimony that Defendants concealed and refused to provide tip-sheets to their employees for review. Either way, Defendants cannot carry their burden of substantiating the tip credit. When an employer's records are inadequate, employees may prove their claims "as a matter of just and reasonable inference," relying "solely on [their] recollection." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Rivera v. Ndola Pharm. Corp.*, 497 F. Supp. 2d 381, 388 (E.D.N.Y. 2007). And under the NYLL, the burden "shifts to [the employer] to prove that '[its employees were] paid wages, benefits[,] and wage supplements.'" *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 255 (S.D.N.Y. 2021) (quoting NYLL § 196-a).

Given Defendants purposeful and vindictive refusal to be forthright in their discovery production, should Defendants magically find tip-records now in an effort to thwart this motion, the Court should deem such production as untimely and refuse to consult it.

Because Defendants cannot satisfy the record keeping requirement necessary to maintain a valid tip-credit allowance. Plaintiffs and the Covered Employees are owed the full minimum wage for every hour paid at the tipped rate.

### B. Defendants Unlawfully Retained Gratuities Earned at Private Events and Buyouts

Plaintiffs and the Covered Employees regularly worked private buyouts and catered events at which guests left substantial gratuities for the service staff. Plaintiffs Lugo and Ray attest that clients at these events left gratuities of "usually several thousands of dollars," but that the amounts distributed to the staff never matched what the clients left, and that their coworkers reported the same. Lugo Decl. ¶ 11; Ray Decl. ¶ 14. Freeman's account is emblematic: after a twelve-hour shift at a wedding she understood to have cost roughly $50,000—where a principal guest announced he would "leave a nice envelope for everyone"—she received a tip of $2.85, and was told the guests had "decided they weren't going to leave a tip after all." Freeman Decl. ¶¶ 11–12. Because Defendants never provided tip sheets, employees had no way to verify what gratuities were collected or whether they were paid what they earned. Lugo Decl. ¶ 12; Ray Decl. ¶ 13.

Defendants tip structure was illegal because Defendants invalid event invoices cause customers significant confusion as to how mandatory surcharges are allocated to employees. *See* **Exhibit Q** (Defendants' Event Invoices). Defendants utilized standardized invoices imposing on the customer a mandatory "Administrative Fee." Customers reading these invoices would reasonably believe that the Administrative Fee would be passed on to staff as a gratuity. An example invoice is seen below:

| | | |
|---|---|---|
| | | Total |
| Food | | [redacted] |
| Venue Fees | | [redacted] |
| Subtotal | | [redacted] |
| Administrative Fee | 22.0% | $5,991.70 |
| Tax | 8.875% | [redacted] |
| F&B Minimum | [redacted] Total<br>[redacted] Met | $0.00 |
| Grand Total | | [redacted] |
| Deposit 1A (Credit Card [redacted] VISA) | Paid 7/29/2020 | [redacted] |
| Deposit 1B (Credit Card [redacted] VISA) | Paid 7/29/2020 | [redacted] |
| Deposit 2B (Credit Card [redacted] VISA) | Paid 1/4/2021 | [redacted] |
| Deposit 2A (Credit Card [redacted] VISA) | Paid 1/14/2021 | [redacted] |
| Balance 1 (Credit Card [redacted] VISA) | Paid 9/28/2021 | [redacted] |
| Balance 2 (Credit Card [redacted] VISA) | Paid 9/28/2021 | [redacted] |
| Balance 3 (Credit Card [redacted] VISA) | Paid 10/7/2021 | [redacted] |
| **Remaining Balance Due** | | **$0.00** |

DEPOSIT/PAYMENT SCHEDULE

| Deposit | Deposit Due Date | 2nd Deposit | 2nd Deposit Due | Balance Due Date |
|---|---|---|---|---|
| [redacted] | 6/19/2020 | $0.00 | | 8/27/2021 |

*Venue Fees* applies to the private use of event spaces within our venue. The amount reflects occupancy for a certain length of time, including the event duration as well as set-up/load-in & break-down/load-out. Pricing may vary pending the scope, timeframe, meal period, and/or seasonal availability.

We dedicate front-of-house & back-of-house support staff specifically to each event. *Staffing* fees are used solely to pay service/catering team individuals, which may include banquet servers, bartenders, bussers, runners, bar backs, coat checkers, security guards, or dishwashers.

*Administrative Fee* facilitates management & supervision of your event, covers overhead house costs, office & back-of-house kitchen staff. This fee also encompasses operational expenses such as, service materials, glassware, dish ware, silverware, house equipment, utilities, and routine venue maintenance. City Winery does not charge supplementary gratuity for banquets or special functions; gratuity is at the discretion of the host and is not expected.

*Defendants' Invoice (Exhibit Q).*

As may be seen from the above invoice, the only statement explaining the Administrative Fee appears in dense, illegible, fine print at the foot of the page.

Due to the language and context of the invoice, a customer reading this document would likely believe that the Administrative Fee is the staff's gratuity. The fee is calculated exactly as a banquet gratuity would be: a fixed percentage (around 20%) added to the charges for food and beverage. In the second paragraph of the invoice disclosure, Defendants detail that they have specifically dedicated front and back of house working each event, and reference staffing fees and administrative fees—both of which are paid out variously to employees. Because the invoice then only charges an administrative fee, but not a staffing fee, customers naturally then believe the

administrative fee would act as gratuity to staff, particularly since it specifically states, "gratuity is not expected." Even if Defendants did not assess a staffing fee on this invoice (or any other invoice *see* **Exhibit Q**), by not including a staffing fee as a line item, the most organic reading of the document presumes that the fee is encompassed as part of the Administrative Fee. This is especially likely as Defendants' administrative fee states that it is used to pay "back-of-house kitchen staff." Thus, Defendants' own statement to customers is that the fee pays employees. This confusion is compounded again as Defendants already charge a "Venue Fee," making the understanding that the Administrative Fee would take the place of staff gratuity even more certain.

New York law supplies the governing standard that this Court should adopt. Section 196-d of the Labor Law prohibits an employer from "retain[ing] any part of a gratuity or of any charge purported to be a gratuity for an employee." N.Y. Lab. Law § 196-d. Whether a mandatory charge is "purported to be a gratuity" is measured from the perspective of the reasonable customer: if a reasonable customer would understand the charge to be a gratuity for the staff, the employer must treat it as one, whatever the employer's private intent. *Samiento v. World Yacht, Inc.*, 10 N.Y.3d 70, 78–79 (2008).

The Hospitality Industry Wage Order codifies that rule in a "rebuttable presumption that any charge in addition to charges for food, beverage, lodging, and other specified materials or services…including but not limited to any charge for 'service' or 'food service…is a charge purported to be a gratuity," 12 N.Y.C.R.R. § 146-2.18(b). These payments must then be "distributed in full as gratuities to the service employees" who provided the service. *Id.* To rebut the presumption, the employer must clearly identify the charge as one for administration and provide "[a]dequate notification." Adequate notification requires a statement "in the contract or agreement with the customer, and on any menu and bill listing prices," that the charge "is not

purported to be a gratuity, and will not be distributed as gratuities to the employees who provided service to the guests." The statement must be (i) written in "ordinary language readily understood" and (ii) appearing "in a font size similar to surrounding text, but no smaller than a 12-point font." *Id.* § 146-2.19(a)-(c). The employer bears the burden of proving, "by clear and convincing evidence," that its notification was sufficient to ensure that a reasonable customer would understand the charge was not purported to be a gratuity. *Id.* § 146-2.19(b); *see Mayes v. Gerber Grp. L.P.*, 2025 N.Y. Slip Op. 50347(U), at *2–3 (Sup. Ct., Kings County Mar. 18, 2025) (applying the presumption to a private-event "Administrative Fee" and holding an express contractual disclaimer insufficient where the employer did not show the required statement appeared on menus and bills in the mandated font).

The Court should apply the same reasonable-customer standard to Plaintiffs' federal claim. The FLSA flatly provides that an employer "may not keep tips received by its employees for any purpose," regardless of whether the employer takes a tip credit. 29 U.S.C. § 203(m)(2)(B). The statute does not define when a mandatory charge functions as a tip, but under federal law, as under New York law, the touchstone is the customer: whether a tip is given, and in what amount, "are matters determined solely by the customer." 29 C.F.R. § 531.52(a). Where an employer's own billing documents lead the customer to understand that a mandatory sur-charge is the staff's gratuity—and discourage any supplementary tip on that very basis—the charge stands in the place of the tip the customer would otherwise have left, and the employer's retention of it is illegal. New York's reasonable-customer standard supplies the sensible rule of decision for that characterization, and applying it here keeps the analysis of the same charge, on the same invoices, consistent across Plaintiffs' federal and state claims.

Measured against the New York standard, which this Court should adopt, Defendants' invoices fail twice over.

First, as described above, their content affirmatively creates the very confusion Section 146-2.19 is designed to prevent. Adequate notification must leave a reasonable customer clearly informed, in ordinary language, that the charge is not a gratuity and will not be distributed to the service staff. 12 N.Y.C.R.R. § 146-2.19(c). Defendants' fine print does the opposite. *See Maor v. Glorious Food, Inc.*, 129 A.D.3d 582, 582 (1st Dep't 2015) (sustaining Section 196-d claim where invoices described a percentage charge as covering "Benefits and Payroll Taxes" and labor, such that a customer could reasonably conclude that a portion was meant for the service staff). Under *World Yacht*, that ambiguity must be resolved by treating the charge as a gratuity. 10 N.Y.3d at 79.

Second, the lone disclaimer Defendants do provide is presented in a form the regulation forbids. The statement that the Administrative Fee is not a gratuity is buried in dense fine print at the very bottom of the invoice, in a font markedly smaller than the surrounding text and well below the 12-point minimum—print no reasonable customer would notice, let alone read. 12 N.Y.C.R.R. § 146-2.19(c). The below example invoice demonstrates the illegibility of this disclosure clearly:

That defect is independently fatal: the First Department has held that an employer's failure to comply with the font-size directive "precludes it from taking advantage of the regulatory safe harbor provision." *Button v. Metro. Club, Inc.*, 187 A.D.3d 630, 630 (1st Dep't 2020). A notice that is inadequate as a matter of form cannot carry Defendants' clear-and-convincing burden. 12 N.Y.C.R.R. § 146-2.19(b).

Defendants therefore cannot rebut the presumption. The Administrative Fee is a charge purported to be a gratuity that was required to be distributed in full to the service employees, 12

N.Y.C.R.R. § 146-2.18(a), and the voluntary gratuities guests left were the employees' property outright—yet Defendants retained both. That retention must violate federal law, Section 196-d and, for the reasons above, Section 203(m)(2)(B) as well.

At the conditional-certification stage, the Court need not decide whether Defendants can ultimately rebut the presumption; it need only find—as the declarations and Defendants' own invoices amply show—that Plaintiffs and the Covered Employees were subjected to the same unlawful policy.

### C. DEFENDANTS' EXCESSIVE NON-TIPPED SIDE WORK INDEPENDENTLY INVALIDATES THE TIP CREDIT

Defendants' requirement that tipped employees spend excessive portions of their shifts on non-tipped side work serves as an independent basis to invalidate the tip-credit. Under New York's Hospitality Industry Wage Order, on any day that a service employee or food service worker works at a non-tipped occupation "(a) for two hours or more, or (b) for more than 20 percent of his or her shift, whichever is less, the wages of the employee shall be subject to no tip credit for that day." 12 N.Y.C.R.R. § 146-2.19. Federal law is in accord: the tip credit is available only for time in a tipped occupation, *see* 29 C.F.R. § 531.56(e), and courts in this Circuit have long applied a twenty-percent threshold to substantial non-tip-producing side work. *See, e.g., Flood v. Carlson Rests. Inc.*, 94 F. Supp. 3d 572 (S.D.N.Y. 2015).

All three declarants attest that Defendants crossed those thresholds as a matter of routine. Lugo spent more than twenty percent of each shift on non-tipped duties—preparing the bar for service, preparing garnishes, mixes, and syrup, cleaning the bar, expediting food orders, cleaning and polishing silverware and glassware, and stocking plateware—and his coworkers performed the same non-tipped work, as they complained to one another while polishing silverware together. Lugo Decl. ¶¶ 9–10. Ray's non-tipped duties "took up at least 2 hours of each of [her] shifts,

representing more than 20% of [her] working time every week"—independently satisfying both prongs of Section 146-2.9—and she observed her coworkers spending the same large portions of their shifts on side work. Ray Decl. ¶¶ 10–12. Freeman, in Pittsburgh, likewise spent over twenty percent of her shifts polishing glassware, grinding espresso beans, preparing and cutting fruit, and restocking drinks. Freeman Decl. ¶ 9. Much of this side work was performed off the clock, before shifts even began. Ray Decl. ¶ 7; Freeman Decl. ¶ 5.

Because Defendants nonetheless claimed the tip credit for every hour, each such shift produced a minimum-wage shortfall. The identical categories of side work, demanded of tipped employees in New York and Pennsylvania alike, reflect a common staffing policy—precisely the showing conditional certification requires. Whether Defendants can ultimately justify the credit for any particular shift is a merits question reserved for a later stage.

### D. DEFENDANTS REQUIRED EMPLOYEES TO WORK OFF THE CLOCK

The FLSA requires employers to pay employees for all hours worked, and to pay one and one-half times the regular rate for hours worked over forty in a workweek. 29 U.S.C. §§ 206, 207. Defendants systematically failed to do so. Ray attests that she and her coworkers were required to arrive early and perform side work—rolling silverware, polishing glassware, and stocking—before being permitted to clock in. Ray Decl. ¶¶ 7–8. Freeman attests to the same pre-shift, off-the-clock side work, as well as mandatory pre-shift meetings and trainings for which employees were not paid, and monthly "deep clean" days—ten-hour shifts that employees were not permitted to clock for and were never paid. Freeman Decl. ¶¶ 5–8. Lugo attests that Defendants' managers routinely waited until employees clocked out and then required roughly thirty additional minutes of work several nights per week, and that his coworkers were subjected to the same practice. Lugo Decl. ¶¶ 7–8.

Because the declarants regularly worked long weeks—Lugo and Ray between twelve and seventy hours per week, and Freeman an average of forty-eight hours per week—the uncompensated time includes unpaid overtime. Lugo Decl. ¶ 6; Ray Decl. ¶ 5; Freeman Decl. ¶ 3. These off-the-clock practices, like the retention of event gratuities, were administered through Defendants' common timekeeping and payroll systems and applied to Covered Employees regardless of location. Lugo Decl. ¶¶ 4, 8; Ray Decl. ¶¶ 4, 8; Freeman Decl. ¶ 8.

## IV. THIS COURT HAS PERSONAL JURISDICTION TO CERTIFY A NATIONWIDE COLLECTIVE

In *Provencher v. Bimbo Foods Bakeries Distribution LLC*, No. 24-3112 (2d Cir. May 4, 2026), the Second Circuit held that, before conditionally certifying an FLSA collective and authorizing notice, a district court must have personal jurisdiction over the defendant with respect to the claims of each potential opt-in plaintiff, applying *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 582 U.S. 255 (2017). Where the court has *general* jurisdiction over the defendant, that requirement is satisfied as to all claims—including those of out-of-state opt-ins—because a defendant that is "at home" in the forum may be sued there on any claim.

This Court has general personal jurisdiction over Defendants. A corporation is subject to general jurisdiction where it is "at home," which for these purposes means its State of incorporation and the State of its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). City Winery, LLC is organized under Delaware law and maintains its principal place of business and headquarters at 25 11th Avenue, New York, New York, from which it directs its national operations; Defendant Dorf owns and directs the enterprise from that same New York headquarters. FAC ¶¶ 5, 9–17. *See also* Kilvert Decl. ¶¶ 2, 9–10 (national booking, corporate marketing, Human Resources, and payroll for all locations were "centralized and operated from the headquarters in New York City,"

and Dorf texted Kilvert "directly regarding work-related matters across Defendants' Restaurants"). Indeed, the FAC expressly pleads that this Court has general personal jurisdiction over the claims of all Plaintiffs, FLSA Collective Plaintiffs, and Class Members on precisely this basis: the Restaurants "constitute a single integrated enterprise centrally controlled through City Winery, LLC," and that enterprise "has a principal place of business at 25 11th Avenue, New York, NY 10011." FAC ¶ 7. Defendants are therefore "at home" in New York.

*Provencher* is thus no obstacle to a nationwide collective here—it is the opposite of Plaintiffs' situation. There, the forum was Vermont and the defendant was incorporated in Delaware and based in Pennsylvania, so the Vermont court lacked general jurisdiction and could not reach the out-of-state drivers' claims. Here, by contrast, Plaintiffs have sued City Winery in its home forum. Because this Court has general jurisdiction over Defendants, it may certify a collective encompassing Covered Employees at all City Winery locations, including those outside New York, and authorize notice to them.

## V. ARGUMENT

### A. <u>The Standard for Conditional Certification Is Lenient</u>

Section 216(b) of the FLSA authorizes employees to sue on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b). Courts in this Circuit apply a two-step framework. *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010). At the first step—conditional certification—"courts utilize a lenient evidentiary standard" and require only that plaintiffs make a "modest factual showing" that they and potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." *Id.* at 555; *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 367–68 (S.D.N.Y. 2007). Plaintiffs need only demonstrate a "factual nexus" between their situation and that of the employees they seek to represent. *Toure v. Cent. Parking Sys. of N.Y.*, 2007 U.S. Dist. LEXIS 74056, at *6* (S.D.N.Y. Sept. 28, 2007). The burden

"is not a stringent one," and the pleadings and supporting declarations are sufficient to meet it. *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 321 (S.D.N.Y. 2007).

### B. THE MERITS OF PLAINTIFFS' CLAIMS ARE IMMATERIAL AT THIS STAGE

At the conditional-certification stage, "the merits of plaintiffs' claim are not at issue." *Fasanelli*, 516 F. Supp. 2d at 322. The Court "does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007). The inquiry is simply "whether the proposed plaintiffs are similarly situated." *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005). Any argument that Defendants did in fact distribute all event gratuities, that their administrative charge is not a gratuity, that the tip credit was properly taken and substantiated, or that they paid for all hours worked is a merits dispute reserved for a later stage.

### C. PLAINTIFFS HAVE MADE MORE THAN THE MODEST FACTUAL SHOWING REQUIRED

Plaintiffs' declarations show that all Covered Employees—regardless of location—were subjected to the same unlawful policies, administered through the same centralized human resources and payroll departments, and Defendants' own standardized event invoices independently corroborate the uniformity of the gratuity-retention policy. Defendants' own former Regional Director of Operations confirms that structure from the inside: Human Resources, payroll, and employment policies were centralized at, and administered from, Defendants' New York headquarters for every location nationwide. Kilvert Decl. ¶¶ 10–11. That is precisely the "common policy or plan" that warrants conditional certification. Because a single affidavit routinely suffices, Plaintiffs' four declarations—three from tipped employees spanning New York and Pennsylvania, and a fourth from Defendants' former Regional Director of Operations—comfortably clear the bar. *See Khalil v. Original Homestead Rest., Inc.*, 2007 U.S. Dist. LEXIS

70372, at *3 (S.D.N.Y. Aug. 9, 2007) (certifying on the complaint and one affidavit); Sipas v. Sammy's Fishbox, Inc.*, 2006 U.S. Dist. LEXIS 24318, at 8 (S.D.N.Y. Apr. 24, 2006) (same).

That the declarants worked at only some of Defendants' locations is no barrier to certifying all of them. Courts routinely certify collectives spanning every location of an employer even where the plaintiff worked at only a fraction of them, so long as common ownership, centralized management, and common systems tie the locations together. In *Garcia v. Chipotle Mexican Grill, Inc.*, the court certified—on a single affidavit—a collective covering more than sixty restaurant locations even though the plaintiff had worked at only five, because the defendant owned and operated all of its locations and managed them centrally. 2016 U.S. Dist. LEXIS 153531, at *1 n.1*, 25 (S.D.N.Y. Nov. 3, 2016). The same is true here: Defendants own and operate every City Winery location and administer wage-and-hour, human-resources, and payroll functions from a common center. Lugo Decl. ¶ 2; Ray Decl. ¶ 1; Kilvert Decl. ¶¶ 1, 7–10.

### D. Early Notice to Similarly Situated Employees Is Appropriate and Necessary

Collective actions further the FLSA's remedial purposes by permitting "efficient resolution in one proceeding of common issues of law and fact" and by lowering individual costs through the pooling of resources. *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Because a potential opt-in's FLSA claim continues to run until he or she files a written consent, 29 U.S.C. §§ 255, 256(b), prompt notice is essential—"potential plaintiffs may be eliminated as each day goes by." *Foster v. Food Emporium*, 2000 U.S. Dist. LEXIS 6053, at 5 (S.D.N.Y. Apr. 26, 2000). The Court need not await the completion of discovery before authorizing notice. *Iglesias-Mendoza*, 239 F.R.D. at 368.

E. Discovery of Names and Contact Information Is Proper and Necessary

Courts in this Circuit routinely order defendants to produce the names and contact information of potential collective members so that notice may be sent. *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202 (S.D.N.Y. 2006); *Fasanelli*, 516 F. Supp. 2d at 323–24. Plaintiffs respectfully request that the Court order Defendants to produce, within ten days of its Order and in Excel format, a list of all Covered Employees, including their names, titles, compensation rates, dates of employment, last-known mailing addresses, email addresses, and all known telephone numbers. Because Defendants' New York employees also hold six-year claims under the New York Labor Law, Plaintiffs further request that, for the New York locations, the list and notice reach back six years, so that a single notice may serve the overlapping federal and state claims in the interest of judicial economy. *See Garriga v. Blonder Builders Inc.*, 2018 U.S. Dist. LEXIS 171887, at *15–17 (E.D.N.Y. Sept. 28, 2018).

F. The Proposed Notice Is Fair and Adequate

Plaintiffs' proposed notice, submitted herewith, provides clear instructions on how to opt in and accurately states the FLSA's prohibition on retaliation. The content of a § 216(b) notice is committed to the Court's broad discretion, *Lee*, 236 F.R.D. at 202, and the proposed notice fulfills the goal of giving potential opt-ins "accurate and timely notice" so that they may make an informed decision about whether to participate. *Fasanelli*, 516 F. Supp. 2d at 323. Plaintiffs respectfully request that it be approved.

G. Equitable Tolling Is Warranted

Plaintiffs respectfully request that the FLSA limitations period be tolled from the filing of the Complaint until notice is issued, so that potential opt-ins are not prejudiced by the time the Court requires to decide the motion and by the delay Defendants' conduct has already caused. District courts in this Circuit regularly grant such relief. *See Ramos v. DNC Food Serv. Corp.*,

2020 U.S. Dist. LEXIS 96123, at 29 (S.D.N.Y. June 1, 2020); *Cabrera v. Stephens*, 2017 WL 4326511, at 7 (E.D.N.Y. 2017).

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) conditionally certify this action as an FLSA collective of the Covered Employees; (2) approve Plaintiffs' proposed notice and authorize its distribution; (3) order Defendants to produce the requested contact information for the Covered Employees within ten days; (4) toll the FLSA limitations period pending the issuance of notice; and (5) grant such other relief as the Court deems just and proper.

Dated: October 22, 2025
New York, New York

Respectfully submitted,
**LEE LITIGATION GROUP, PLLC**

By: */s/ C.K. Lee*
C.K. Lee, Esq. (CL 4086)
Lee Litigation Group, PLLC
148 West 24th, 8th Floor
New York, NY 10011
Tel: (212) 465-1188
Email: cklee@leelitigation.com
*Attorneys for Plaintiffs, FLSA Collective Plaintiffs and the Class*

**WORD COUNT CERTIFICATE**

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York. This certificate certifies that the document complies with the word count limit. Compliance relied on the word count of the word-processing system used to prepare the document. The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities and signature block is 6,811 words.

Dated: July 30, 2026
New York, New York

*/s/ C.K. Lee*
C.K. Lee, Esq.